**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 30 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

DIANE CALHOUN,

      Plaintiff-Appellant,

v.

JO ANNE B. BARNHART,
Commissioner, Social Security
Administration,

      Defendant-Appellee.

No. 02-5212
(D.C. No. 01-CV-897-M)
(N.D. Okla.)

**ORDER AND JUDGMENT** *

Before **TYMKOVICH** , **HOLLOWAY** , and **ANDERSON** , Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

\*     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Claimant Diane Calhoun appeals the district court's affirmance of the decision by the Commissioner of Social Security denying her application for disability benefits. Because the Commissioner's decision was supported by substantial evidence and no legal errors occurred, we affirm.

This is claimant's second application for benefits. Claimant filed this application in March 1995, alleging she was unable to work after June 30, 1989, due to fibromyalgia, Raynaud's disease, lung disease, depression, chronic fatigue, and pain. Because claimant's insured status expired on September 30, 1991, the only issue is whether her condition was disabling before that date.

Claimant's medical records show the following. In 1980, she fractured her right kneecap while rollerskating, requiring surgery. In 1981, she underwent a repair of a torn meniscus in her left knee. In June 1983, she sought treatment from Dr. Lins for headaches, neck, leg and back pain. Claimant complained of aching over the anterior tibial regions of her legs and pain on the bottoms of her feet. She also reported that her legs fatigued easily, and that she had numbness and tingling in the left lateral thigh and lower leg. Aplt. App., Vol. II at 250.

Claimant's June 1983 EMG of her lower extremities was normal. In July 1983, she was hospitalized for evaluation of her complaints. Claimant's EEG was normal, x-rays were normal, and CT scans were normal except for

a bulging disc at L4-5 and L5-S1. Myelograms of claimant's cervical and lumbar spines were normal except for a questionable double density at L5-S1.

Dr. Lins diagnosed claimant with degenerative lumbar disc disease, chronic cervical and trapezius myofascial spasm causing headaches, and chronic anxiety depressive syndrome. *Id.* at 249. Claimant underwent physical therapy, was placed on an at-home exercise regimen, and was given medication. In September 1983, she stopped all medications except for Vicodin, and was noted to have returned to work several hours a day. *Id.* at 268. Claimant did not seek treatment from Dr. Lins again after September 1983.

In November 1983, claimant was admitted to Saint Francis Hospital with complaints of abdominal pain and fever. Claimant appeared to be mildly depressed and in no apparent distress. Normal results were obtained from the stool cultures, abdominal x-rays, CT scan, upper GI series, colon series, small bowel series, and views of the bladder. Colonoscopy was also normal, other than some irritation and spasm in the colon. Claimant was diagnosed with a functional bowel disorder with psychological overlays, and her physician recommended that she see a psychiatrist for antidepressants. *Id.* at 270.

Claimant worked full time during 1984 and part of 1985. In June 1985, claimant filed her first application for disability benefits based on leg pain. In August 1985, she was examined by a consulting physician, who found normal

results except minimum osteoarthritic changes in the right knee with some osteophyte formation and slight joint narrowing. The physician noted normal range of motion in all joints except for a slight limitation of knee flexion, and opined that there might be a psychological component to her pain. *Id.* at 280.

Claimant underwent a psychological consultative examination in October 1985. She reported increasingly severe leg pain over the previous three years, which required her to take multiple hot baths and Vicodin. Although she had denied any weight loss in the August consulting exam, in this exam she reported a thirty pound weight loss during the prior five months. Claimant reported suicidal ideation and depression. Dr. Passmore diagnosed claimant with psychogenic pain disorder and depression, and recommended treatment with antidepressants and a chronic pain program. *Id.* at 284. He opined that her functioning had been good earlier in the year before she became depressed, which brought her current functioning to fair.

In November 1985, claimant was treated in the Saint Francis emergency room for chest pain. She alleged that she suffered a heart attack from mercury vapors a day earlier when her dentist was removing a filling, and that she had undergone CPR. Claimant's chest x-rays and an electrocardiogram were normal. *Id.* at 288.

Claimant's 1985 application was denied at the first two administrative levels. In April 1986 she withdrew her application, stating that she had been undergoing chiropractic care and she thought she could control her pain enough to return to work. *Id.*, Vol. III at 290.

In August 1987, claimant began treatment with her family physician, Dr. Patton. Notes from the initial visit describe claimant's complaints of pain in her cervical spine, right shoulder, and down her legs, but there is no report of a physical examination or any medical findings. *Id.* at 362. Claimant sought a refill of her Vicodin prescription, and reported that she recently got a swimming pool which seemed to help her pain. *Id.*

Dr. Patton's records span from 1987 through 1998. During that period, Dr. Patton refilled claimant's prescription for Vicodin at least ninety-four times. Yet, his records contain almost no medical findings regarding claimant's condition, and do not demonstrate any limitations on her abilities. Dr. Patton appears to have prescribed the pain medication based on claimant's complaints of pain, and later, based on the Springer Clinic's 1995 diagnosis of fibromyalgia.

The record shows that claimant saw Dr. Patton on a regular basis. In February 1988, the physician noted the possibility that claimant suffered from

Raynaud's phenomenon.[1]  He did not, however, indicate that this condition affected claimant's functional abilities.  During the next few years, claimant saw Dr. Patton for injections of estrogen, testadiol, and depo-testadiol; had blood work done; and received treatment for menopausal syndrome, irritable bowel syndrome, laryngitis, sore throats, coughs, and weight loss.

Before claimant's insured status expired on September 30, 1991, Dr. Patton's records show only occasional complaints of pain or weakness. Claimant reported lumbar pain in the fall of 1988, *id.* at 361; pain in her neck, trapezius and shoulder in August 1989, *id.* at 359; pain in her neck, leg, and hip, with burning feet in May 1990, *id.* at 356; extreme weakness and fatigue in February 1991, *id.* at 355; and a headache, shoulder pain, and cervical spine pain, with a "pins and needles" sensation in her arm in February 1991, *id.* at 354.  No functional limitations were noted by Dr. Patton during this time.  To the contrary, Dr. Patton noted in March 1991 that claimant was walking three miles a day as part of her weight-loss regimen.  *Id.* at 354.

After her insured status lapsed, claimant's complaints of pain increased. In November 1991 she reported that her knees hurt and her legs ached from the

---

[1]    Raynaud's phenomenon is characterized by spasm of the digital arteries in the fingers and toes, often brought on by cold, indicated by a severe pallor and accompanied by numbness and pain.  Stedman's Medical Dictionary 1365 (27th ed. 2000).

mid-thigh down, *id.* at 352. In July 1992, claimant complained that her knee popped while walking down steps, and that she was experiencing mid-calf pain. *Id.* at 351. In December 1992, she complained that the bottom of her feet hurt, and that she had generalized pain. *Id.* at 350. In April 1993, claimant complained of pain in her left lateral leg, and in the summer of 1993, she complained of pain in her back, knees, and down her legs. *Id.* at 349. In December 1993, claimant reported that the right side of her body ached, and that she was sensitive to light touch. *Id.* at 348.

In May 1994, claimant sought treatment from the Springer Clinic for body pain and problems with her fingernails and toenails. In claimant's intake questionnaire, she reported that she was "self-employed," and the clinic records noted on two separate dates that claimant was self-employed raising dogs. *Id.* at 373, 376, 380. When giving her medical history, claimant reported that she had been in severe chronic pain since she was eighteen, and denied that she was depressed. Claimant was diagnosed with fibromyalgia, chronic obstructive pulmonary disease, skin fungus, and Raynaud's disease. She continued treatment at the clinic through July 1994. When she returned to Dr. Patton in July 1994, she reported that she had been diagnosed with fibromyalgia. *Id.* at 346.

In March 1995, claimant filed her current application for disability benefits, alleging that she became unable to work on June 30, 1989. As noted, claimant's

insured status expired on September 30, 1991. After her application was denied at the first and second administrative levels, she participated in a hearing before an administrative law judge (ALJ) on March 15, 1996. Claimant was represented by counsel. At the hearing, claimant submitted a note from Dr. Patton that stated

> Diane Calhoun continues to have complaints of fibromyalgia. Medication seems to help a little, other than pain medication. Her condition has slowly phyically (sic) and mentality (sic) deteriorated in the last five (5) years.

*Id.* at 408.

On April 5, 1996, the ALJ issued his decision finding that claimant suffered from depression and back pain, but that she had the ability to perform her past relevant work as a cashier. The ALJ determined that claimant was moderately limited in her ability to understand and carry out detailed instructions; moderately limited in her ability to complete a normal work day or week without interruptions from psychologically-based symptoms or excessive rest periods; moderately limited by a chronic pain syndrome which might interfere with her work schedule; slightly limited in her activities of daily life; moderately limited in her ability to maintain social functioning; often limited by a deficiency of concentration, persistence and pace; but that she never had episodes of decompensation or deterioration at work.

The Appeals Council accepted review and remanded the case to the ALJ for further development of the record. The ALJ was directed to obtain evidence

regarding the effects of claimant's fibromyalgia and mental condition and to obtain supplemental evidence from a vocational expert clarifying the effect of the assessed limitations on claimant's occupational base. *Id.* at 430.

After remand, the ALJ scheduled claimant for consultative physical and mental examinations. Claimant, through her attorney, refused to attend either consultation. *Id.* at 436, 456. Instead, claimant submitted Dr. Patton's records from 1995 to 1998, and a residual functional capacity form completed by Dr. Patton in December 1998. Dr. Patton concluded that claimant could sit, stand, or walk for up to an hour, and that she could alternate positions for two to three hours. Claimant was limited to two to three hours of lifting up to ten pounds, and one hour of lifting eleven to twenty-five pounds. In contrast, he opined that claimant could carry up to ten pounds for an hour, but could carry eleven to twenty-five pounds for two to three hours during the day. Claimant could only use her arms for an hour, could use her hands for two to three hours, could never stoop, but could squat, crawl or climb for an hour. During an eight-hour day, Dr. Patton opined that claimant would have to lie down or recline frequently due to pain and fatigue. When asked what medical findings supported his opinion, Dr. Patton answered "Fibromyalgia." *See id.* at 448-49.

After claimant refused to attend the consultative examinations, the Social Security Administration advised claimant's counsel that he was responsible for

providing the information requested by the Appeals Council. *Id.* at 457. In May 1999, claimant's attorney submitted a third opinion by Dr. Patton and informed the ALJ that they could not provide a psychological assessment because claimant was not getting psychiatric treatment. Upon learning that the hearing would not proceed without a psychological assessment, claimant's counsel sought to reschedule the consultative exam. The ALJ instead elected to have a psychiatric medical expert at the hearing.

Dr. Patton's May 1999 letter stated that he had treated claimant for years, that she suffered from fibromyalgia, that over the years he had noted a deterioration in her mental and physical capabilities, that medical care had not significantly improved her condition, that pain medication provided some relief but could not diminish the accompanying fatigue, that claimant's range of motion and ambulation were not affected, that her joints showed no swelling, instability, or atrophy, that she had no radiculopathy, neurological findings, or paresthesia, and that her condition would remain the same because fibromyalgia was a chronic illness. *Id.* at 450.

Dr. Patton's May 1999 evaluation opined that claimant could only sit or stand for thirty minutes and walk for ten minutes, and that she could only perform these activities for six hours out of an eight-hour day. *Id.* at 451, 468. Claimant could lift up to twenty pounds occasionally, and could never lift over twenty

pounds. Yet, she could carry up to ten pounds frequently, and could carry eleven to twenty-five pounds occasionally. *Id.* at 451. Her ability to use her feet, hands, or fingers for repetitive movement was limited, and although she could bend and squat occasionally, she could never crawl, climb, or reach. When requested for the objective medical findings supporting his opinion, Dr. Patton identified that claimant had tenderness in all muscle groups, she participated in limited physical activities, and she was tender to light touch. *Id.* at 452. When asked whether there were any objective findings to support claimant's subjective complaints, Dr. Patton replied "no." *Id.*

In yet another report prepared by Dr. Patton in October 1999, the physician opined that before September 30, 1991, in an eight-hour day claimant could only sit for half an hour, stand for half an hour, walk for fifteen minutes, and lie down or recline for four to six hours. Claimant could only lift ten pounds for an hour, but could lift eleven to twenty pounds for two to three hours. Although the physician opined that claimant could never lift more than twenty pounds, he also stated that she could carry eleven to twenty-five pounds for two to three hours. Dr. Patton opined that claimant could carry up to ten pounds for four to five hours. She could use her arms and hands for two to three hours, stoop or squat for two to three hours, but she could never crawl or climb. She would need to rest due to pain and fatigue. Again, the only medical finding identified by

Dr. Patton to support his opinion was that claimant suffered from generalized fibromyalgia. *Id.* at 470-71.

On October 27, 1999, the ALJ conducted a second hearing, at which claimant, a psychological medical expert, and a vocational expert testified. At the hearing, the psychological medical expert stated that he was unable to assess claimant's mental status prior to September 30, 1991, because there was no evidence in the record upon which he could base an opinion. *Id.*, Vol. II at 92-93. After claimant testified, the psychological medical expert stated that based on claimant's description of her condition from 1989 through 1991, her condition would have equaled Listing § 12.04 of the social security regulations for an affective disorder. *Id.* at 139-40.

On January 7, 2000, the ALJ issued his decision finding that claimant was not disabled before her eligibility lapsed on September 30, 1991. The ALJ found that although claimant suffered from generalized fibromyalgia before that date, the record did not contain medical evidence that she was impaired by lung disease, Raynaud's disease, skin fungus, or depression during the period in question. He found that although claimant had been treated for depression when her mother died, there was no showing of continuous treatment, and the record showed that claimant was capable of performing activities of daily life and social functioning requiring significant concentration and attention.

The ALJ found that claimant was not entirely credible based on numerous inconsistencies in the record and her demeanor at the hearing. He determined that Dr. Patton's opinion of claimant's 1989-1991 abilities did not meet the requirements to be given controlling weight, and that it should be rejected based on its inconsistency with the record and with Dr. Patton's other opinions. The Appeals Council denied review, making the ALJ's determination the final decision of the Commissioner. The district court affirmed, and this appeal followed.

We review the Commissioner's decision to determine only whether it is supported by substantial evidence and whether legal errors occurred. *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000). Substantial "evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). We may not reweigh the evidence or substitute our judgment for that of the agency. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

Claimant argues that the ALJ committed legal error by disregarding her treating physician's opinion about her abilities prior to the expiration of her insured status. A treating source's opinion is to be given controlling weight if it is "well supported by medically acceptable clinical . . . diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R.

§ 404.1527(d)(2); *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001); *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987).

If the ALJ decides that a treating source's opinion is not entitled to controlling weight, he must determine the weight it should be given after considering: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the treating source's opinion is supported by objective evidence; (4) whether the opinion is consistent with the record as a whole; (5) whether or not the treating source is a specialist in the area upon which an opinion is given; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. § 404.1527(d)(2); *Drapeau*, 255 F.3d at 1213. An ALJ cannot reject a treating source's opinion without identifying "specific, legitimate reasons." *Frey*, 816 F.2d at 513.

Here, the ALJ rejected family physician Dr. Patton's opinion of claimant's limitations before September 30, 1991, because it was not supported by medical findings, and because it was inconsistent both with the record and with his other reports. These reasons are well-supported by the record. From June 30, 1989 to September 30, 1991, claimant complained of body pain or weakness on five occasions. The records do not show that Dr. Patton performed any examinations,

-14-

and there are no functional limitations noted. He did not note any extremity weakness or muscle atrophy, both of which may be determined objectively. He did not perform a trigger point evaluation. Dr. Patton's treatment of claimant's condition during this period is limited to recording her subjective complaints and prescribing Vicodin.

Further, Dr. Patton's retroactive description of claimant's functional capacity prior to September 30, 1991, is contradicted by his own records and reports. In March 1991, he noted that claimant was walking three miles a day, whereas in 1999 he opined that in 1991 she could only walk for fifteen minutes. His 1996 report that claimant had deteriorated significantly for the prior five years is contradicted by his later reports showing less limitations in 1998 than her alleged condition in 1991. His several ability assessments were inconsistent, showing claimant could carry amounts she was unable to lift, and her ability to use her arms, crawl, climb, or reach, changed from report to report. Claimant's extended delay in applying for benefits and her refusal to attend a consulting examination prevented the agency from obtaining any evidence that could support Dr. Patton's opinion regarding her abilities. We conclude the ALJ did not err in rejecting Dr. Patton's assessment of claimant's functional capacity during the relevant period.

Claimant argues that the ALJ erred in finding her testimony not entirely credible. Credibility determinations are peculiarly within the province of the ALJ. *White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2002). Such assessments are entitled to "particular deference" when supported by substantial evidence. *Id.* at 909-910. Here, the ALJ evaluated claimant's subjective complaints of disabling pain and fatigue in accordance with the requirements of *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). He acknowledged that claimant had a condition that was likely to cause pain and that claimant took pain medication which helped to relieve that pain. In considering her daily activities, the ALJ identified numerous inconsistencies between claimant's hearing testimony and her descriptions of her abilities in the record. He also noted his own observations of claimant's demeanor at the hearing. Because the ALJ closely and affirmatively linked his credibility findings to substantial evidence, including the many inconsistencies in the record, we will not upset his conclusion that claimant was not wholly credible.

Finally, claimant argues that the ALJ's assessment of her residual functional capacity is not supported by the evidence. Aside from claimant's testimony, the record does not contain any objective evidence that claimant was functionally limited between June 30, 1989 and September 30, 1991. Claimant

had a full range of motion, with no evidence of joint inflammation, muscle weakness or atrophy.

The ALJ accepted that claimant suffered from fibromyalgia before her insured status lapsed. On this basis, he precluded claimant's ability to perform medium or heavy work, concluding those levels would aggravate her condition. He relied on the state physicians' opinions at the earlier administrative levels, that claimant could work despite her condition, in concluding that she could still perform sedentary and light work. *See* 20 C.F.R. § 404.1527(f)(2)(i).

The ALJ also accepted that claimant's condition caused her chronic pain for which she took pain medication. He therefore found that she was moderately limited in her ability to understand, remember and carry out detailed instructions; moderately limited in her ability to complete a work day or week without interruptions, and moderately limited in her ability to interact with the general public. We conclude the ALJ's assessment of claimant's capabilities was supported by substantial evidence.

The judgment of the district court is AFFIRMED.

Entered for the Court

William J. Holloway, Jr.
Circuit Judge

-17-