**F I L E D**

**UNITED STATES COURT OF APPEALS**

**February 9, 2007**

**FOR THE TENTH CIRCUIT**

BONNIE MERAOU,

     Plaintiff-Appellant,

v.

THE WILLIAMS COMPANY LONG
TERM DISABILITY PLAN, Sued as:
The Williams Companies, Inc.
Long-Term Disability Plan,

     Defendant-Appellee.

No. 06-5051
(D.C. No. 04-CV-102-EA)
(N.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

---

Bonnie Meraou appeals the district court's January 20, 2006, judgment

affirming the decision by the Administrative Committee of The Williams

Company ("TWC") Long-Term Disability Plan (the "Plan") terminating

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Ms. Meraou's long-term-disability (LTD) benefits under the Plan. We exercise jurisdiction under 28 U.S.C. § 1291, and affirm.

## I. Background

Ms. Meraou was hired by TWC in 1987 as a systems analyst. During her employment at TWC, she became a participant in the Plan, which provides LTD benefits to eligible participants.[1] In 1992 she began receiving LTD benefits under the Plan, based on diagnoses of fibromyalgia, osteoarthritis, cervical facet atropathy, migraine headaches, and depression. She continued to receive these benefits until they were terminated in August 2002. On September 18, 1994, Ms. Meraou was approved for social security disability benefits, which were awarded retroactively to July 1992.

### a. Provisions of Plan

The Plan defines "Total Disability" in pertinent part as follows:

"Totally Disabled" or "Total Disability" means, [after the] twenty-four (24) month [elimination] period . . . the inability of such

---

[1] References to specific provisions of the Plan are to the January 1, 2002, version of the Plan, and amendments thereto, contained in the administrative record and provided to us as part of Appellant's Supplemental Appendix. The district court, and both parties in their appellate briefs, have cited this version of the Plan for its relevant terms. The 2002 version of the Plan specifically provides that "[a]ny individual who participated in the Prior Plan on December 31, 2000, and who was Totally Disabled on such date, shall continue to participate under this Plan" in accordance with its provisions. Aplt. Supp. App., Vol. II, at 405. The Supplemental Appendix volumes are paginated as follows: "BM/TWC.####", where "####" represents the page number within the appendix. We have abbreviated the numbering by deleting the reference to "BM/TWC."

Participant, based upon conclusive medical evidence, to engage in any gainful occupation for which he or she is reasonably fitted by education, training or experience, as determined by the Plan Administrator.

Aplt. Supp. App., Vol. II, at 403-04. A totally disabled participant is entitled to payment of monthly disability benefits, but such disability benefits may terminate if the Participant ceases to be totally disabled. They may also terminate if the Participant fails to provide evidence that she remains under a physician's care, or if she fails to provide current medical information regarding the condition of her health. Specifically, paragraph 3.10.2 of the Plan provides:

The Plan Administrator shall from time to time and in any event at least every two (2) years require any Participant who shall be receiving Monthly Disability Payments to provide to the Plan Administrator current medical information from his physician, or physicians the Plan Administrator selects, regarding the condition of his health, including evidence of such Participant's continued Total Disability. Unless a Participant within a reasonable period of time complies with a request of the Plan Administrator to be provided with such information, the Plan Administrator may terminate the Participant's Monthly Disability Payments.

*Id.* at 417. Paragraph 3.10.4 further provides:

While receiving Monthly Disability Payments, a Participant shall remain under the regular and appropriate care and treatment of a qualified Physician and, upon request of the Plan Administrator, shall provide evidence thereof satisfactory to the Plan Administrator. If a Participant fails either to remain under such care or to provide such evidence, the Plan Administrator may terminate such Participant's Monthly Disability Payments.

*Id.* at 418.

-3-

### b. Procedural History

### 1. Initial Denial

On February 27, 2002, the claims administrator for the Plan, Kemper National Services of Kemper Insurance Companies (Kemper),[2] requested certain updated medical information from Ms. Meraou.  According to a July 3, 2002, letter to Ms. Meraou from Kemper, this request asked her to supply "an Attending Physician Statement along with six month[s] of Current office, surgery, therapy, treatment and/or chart notes, along with medical documentation from your treating physicians, i.e., labs, blood work, physical exam, MRI/x-ray results and any other diagnostic test results pertaining to the condition for which you are currently treated for from Dr. Weldon and Dr. Tom[ecek]." *Id.*, Vol. I, at 67-68. In response Ms. Meraou supplied an attending physician's statement from Dr. Weldon.  The statement, however, was not accompanied by the requested progress notes.

On April 24, 2002, Kemper requested that Ms. Meraou make an appointment with Dr. Tomecek, as TWC had prepaid for an attending physician's statement and six months of current progress notes from him.  On May 16, 2002, Ms. Meraou advised Kemper that a new physician, Dr. Anthony, was treating her,

---

[2]    Kemper is now known as "Broadspire."  But because it was known as Kemper during the time period in question, we continue to refer to it as "Kemper."

-4-

and that she would have him send six months of progress notes.  As of July 3, 2002, however, she had not supplied the attending physician's statements and progress notes from Drs. Tomecek and Anthony, or the progress notes from Dr. Weldon.  Kemper warned her that if she failed to supply this information by July 30, 2002, her disability benefits would be terminated effective August 5, 2002.  When the documents were not received by August 6, 2002, Kemper unsuccessfully attempted to reach Ms. Meraou by telephone.  By letter dated August 7, 2002, Kemper notified Ms. Meraou that her LTD benefits had been terminated effective August 1, 2002, because of her failure to supply the requested information.

## 2.  First-level Appeal

Kemper received Ms. Meraou's first-level administrative appeal on August 29, 2002.  On September 17, 2002, Ms. Meraou faxed to Kemper three medical records to be considered in connection with her appeal:  an initial-office-visit-and-evaluation report from Dr. Tomecek dated January 22, 2001; an operative report from Dr. Tomecek dated February 9, 2001; and a letter from Dr. Welden to Kemper's Appeals Division dated August 22, 2002, concerning Ms. Meraou's diagnoses and treatment.  In addition, on August 16, 2002, Dr. Welden telephoned in a report to the Appeals Division, which reached them before the appeal had actually been filed.  On September 23, 2002, Kemper wrote

to Ms. Meraou, requesting a 30-day extension to supply her with a written decision, in order to permit Kemper to review all the information in her file.

At this point in the appeals process, the emphasis seems to have expanded from the procedural issue of Ms. Meraou's failure to supply the requested medical records to include the additional, substantive question of whether she remained disabled. Thus, on September 23, 2002, Kemper referred the case to a consulting physician specializing in internal medicine and endocrinology, Dr. Tamara Bowman, to prepare a peer-to-peer review designed to answer the following question: "Does the medical evidence submitted support a disability from 8/1/02? If does not support, please indicate detailed reasons why and what can be sent on appeal that would support a functional impairment." Aplt. Supp. App., Vol. I, at 234. After examining statements from Ms. Meraou, medical records from Dr. Welden and Dr. Royal, an anaesthesiologist, and clinical records from the Welfit Medical Clinic and the Pain Evaluation and Treatment Center, Dr. Bowman determined that the evidence "[f]ail[ed] to support [disabling] functional impairment(s)," *id.* She suggested that "[i]f additional documentation were to be submitted on appeal, then a functional capacity evaluation and recent comprehensive musculoskeletal, joint, and neurologic examinations would be most relevant." *Id.* at 237.

On October 28, 2002, Kemper requested an additional 30-day extension to review its file, promising a decision by November 22, 2002. Kemper then

obtained an employability-assessment report and a labor-market survey, which indicated that Ms. Meraou could do sedentary skilled and semi-skilled work, and that within 50 miles of her home there were jobs available of the type that she had previously performed. On December 6, 2002, Kemper notified Ms. Meraou that it had completed its review of her appeal. It upheld the decision to deny her LTD benefits, because of "a lack of medical evidence to support [her] inability to perform sedentary work." *Id.* at 256.

### 3. Second-level Appeal

Ms. Meraou obtained the services of counsel, who submitted a second-level appeal (motion for reconsideration) on January 22, 2003. Ms. Meraou requested an extension of 30 days to submit additional evidence and arguments in support of her appeal. She thereafter requested, and Kemper granted, further extensions to permit her to submit additional evidence. Kemper granted a final extension to July 7, 2003, stating that no further extensions would be granted.

On May 29, 2003, Ms. Meraou sent Kemper her videotaped statement together with a transcript, and on July 3 she sent records from Dr. Crass, a psychologist. During July 2003 Kemper obtained additional peer reviews, from a doctor of internal medicine, Dr. Russell Superfine; a rheumatologist, Dr. Sheldon Zane; an orthopedic surgeon, Dr. Ira Posner; and a psychologist, Dr. Elana Mendelssohn. Each of these doctors opined, based on a review of Ms. Meraou's medical records, that she was not disabled. Additionally, by August 4, 2003,

Dr. Bowman had conducted a supplemental peer review, based on additional records from Drs. Anthony, Weldon, and Royal, and additional hospitalization and office-visit notes, that reached the same conclusion as her previous peer review: Ms. Meraou was not functionally impaired.

On August 13, 2003, Ms. Meraou requested an additional delay of Kemper's decision for 35 days, in order to obtain a three-day functional capacity examination. She also requested that Kemper pay for the examination. Kemper rejected the request for payment but granted the postponement.

On September 5, 2003, Ms. Meraou requested that Kemper further delay its decision on her claim until its October 2003 meeting. Counsel explained that Ms. Meraou had arranged for neuropsychological testing but would be financially unable to have a functional-capacity test performed. On October 7, 2003, Ms. Meraou notified Kemper that she had postponed the neuropsychological exam until October 28, 2003, and requested a delay of the review of her claim until December 11, 2003.

On October 28, 2003, Ms. Meraou was seen by Dr. Sherman, who conducted a neuropsychological examination. By November 14, 2003, however, Kemper had not received the record of this examination, and on that date it advised Ms. Meraou that she should submit the record of the examination by November 26, 2003, to be available for consideration at the December 11, 2003, meeting. Kemper stated that if the record were submitted after November 26,

2003, her appeal would be considered at the January 2004 meeting; and if the record was not submitted by December 18, 2003, her appeal would nevertheless be decided at the January meeting without consideration of the additional information. Ms. Meraou forwarded the record on November 21, 2003.

On December 11, 2003, the Plan's Administrative Committee met and considered Ms. Meraou's appeal. After thoroughly reviewing and discussing the medical and other evidence provided, the Committee unanimously voted to deny the appeal. In a letter to Ms. Meraou's attorney, the Committee explained that based upon its review of the medical information and documentation provided, "the Committee has concluded that Ms. Meraou is capable of engaging in a gainful occupation as defined in the Plan, and therefore is not 'totally disabled' under the Plan's definition, as applicable to Ms. Meraou." Aplt. Supp. App., Vol. II, at 397.

### 4. District-court Review

The Employment Retirement Income Security Act of 1974 (ERISA) provides that a plan participant may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Acting under this provision, Ms. Meraou filed in district court a complaint for review of the termination of her LTD benefits. After analyzing the evidence the court determined that TWC's decision to

terminate Ms. Meraou's LTD benefits was supported by substantial evidence and was not arbitrary and capricious. It therefore upheld the decision terminating benefits.

## II. Analysis

### a. Standard of Review

There is no dispute that the Plan expressly gives the Administrative Committee "sole and absolute discretion" to determine "whether to grant or to deny any claim for benefits under this Plan." Aplt. Supp. App., Vol. II, at 424. "Therefore, we apply an arbitrary and capricious standard to [the Plan] administrator's actions." *Allison v. UNUM Life Ins. Co. of Am.*, 381 F.3d 1015, 1021 (10th Cir. 2004) (brackets and internal quotation marks omitted). "The district court's determination of whether a plan administrator's decision is arbitrary and capricious is a legal conclusion subject to de novo review." *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1119 (10th Cir. 2006).

"In determining whether [the Administrative Committee's] decision is arbitrary and capricious, we consider only the arguments and evidence before the administrator at the time it made that decision and decide: (1) whether substantial evidence supported [the administrator's] decision; (2) whether [the administrator] based its decision on a mistake of law; and (3) whether [the administrator] conducted its review in bad faith or under a conflict of interest." *Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 379 F.3d 1168,

1176 (10th Cir. 2004) (internal quotation marks omitted). "The Administrator's decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within his knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on any reasonable basis." *Id.* (internal quotation marks omitted).

### b. Substantial Evidence

Ms. Meraou contends that the Administrative Committee's decision lacked substantial evidence, "[p]articularly in light of the overwhelming evidence of disability." Aplt. Opening Br. at 26. As we have noted, the Administrative Committee obtained opinions from five consulting physicians who opined that Ms. Meraou had failed to establish a disability under the definition contained in the Plan. Additionally, Dr. Sherman, the neuropsychologist who conducted an independent examination on behalf of Ms. Meraou, did not expressly find her disabled from all work. Although he said that "the combination of her ongoing physical and emotional symptoms likely render her unable to return to her previous work as a systems analyst," Aplt. Supp. App., Vol. I, at 11, he added that further treatment should "enable some degree of vocational functioning" and that "referral for comprehensive vocational evaluation following appropriate psychotherapeutic treatment will be helpful in facilitating some type of gainful employment," *id.*

The fact that Ms. Meraou's personal physician, Dr. Welden, reached an opposing conclusion concerning disability is not, in and of itself, a basis for reversal. *See, e.g., Johnson v. Metro. Life Ins. Co.,* 437 F.3d 809, 814 (8th Cir. 2006) ("When there is a conflict of opinion between a claimant's treating physicians and the plan administrator's reviewing physicians, the plan administrator has discretion to deny benefits unless the record does not support denial."); *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 606 (4th Cir. 1999) (plan fiduciary may deny disability benefits when conflicting medical opinions are presented); *see also Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (plan administrator could rely on physician's report concluding claimant was not disabled when it determined that the report "was more detailed, that it contained more objective medical findings, and that his conclusions made more sense based on the medical evidence" than a competing report concluding claimant was disabled). In ERISA cases no special deference is due the opinion of the claimant's treating physician. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). Although Ms. Meraou suggests that consultants employed by the Plan may have financial incentives to make a finding of "not disabled," Aplt. Opening Br. at 26, the Supreme Court has recognized that contrary incentives may also motivate a claimant's treating physician. *See Black & Decker*, 538 U.S. at 832 ("[A] treating physician, in a close case, may favor a finding of 'disabled.'").

Ms. Meraou challenges the validity of the consultants' opinions, however, on several specific grounds. First, she asserts that the consultants improperly relied on a lack of objective evidence to support the existence of her allegedly disabling conditions. Second, she claims that the consultants failed to consider the combined effect of her impairments on her ability to work. Third, she challenges Dr. Bowman's evaluation of her fibromyalgia. We turn now to those specific challenges.

### 1. Objective Evidence of Disability

Ms. Meraou argues that the consultants' opinions were flawed because they did not deny that she has the various conditions that she claims to be disabling, but nevertheless required "recent objective testing to indicate these conditions exist." Aplt. Opening Br. at 25. She contends that in light of the diagnoses received from her own doctors over the years, it should have been unnecessary to provide objective findings to substantiate the existence of her conditions.

Ms. Meraou's argument rests in large part on a misunderstanding of the consultants' opinions. For the most part the consultants did not state that Ms. Meraou needed objective evidence to document the *existence* of her medical conditions, already diagnosed by her doctors. Objective evidence, in their opinion, was necessary primarily to confirm the *disabling severity* of these conditions.

Dr. Bowman, for example, acknowledged that Ms. Meraou "has multiple medical conditions, including a seizure disorder, history of positive rheumatoid factor, lumbar and cervical disc disease, fibromyalgia, and migraine headaches." Aplt. Supp. App., Vol. I, at 237. She noted, however, the lack of evidence regarding the currently disabling severity of these conditions. Specifically, there was no documentation concerning Ms. Meraou's response to recent medical procedures performed to alleviate pain, the functional deficits resulting from her alleged disc disease, any seizure activity within the past year, or any actively disabling arthritis symptoms. Dr. Bowman concluded that the available objective evidence did not establish the disabling nature of her medical conditions.

Dr. Posner noted Ms. Meraou's "positive discogram at L4-5," her complaints of pain, and the relief she obtained from spinal blocks and ablation therapies. *Id.*, Vol. II, at 323. But he concluded that "there is no objective documented physical findings in the medical records which would, from an orthopedic point of view, indicate that this claimant is functionally totally disabled from performing any occupation." *Id.* Dr. Posner concluded that, because of the lack of objective evidence, he could not quantify the effect of Ms. Meraou's spinal impairments on her ability to work.

Dr. Mendelssohn acknowledged that Ms. Meraou had a history of depression and could be experiencing emotional and cognitive difficulties. She noted, however, that "the most recent documentation does not provide objective

-14-

findings or behavioral observations substantiating how the claimant's difficulties are impacting her functioning and preventing her from performing useful work." *Id.* at 327.

Although Dr. Zane acknowledged Ms. Meraou's "slightly positive RA/ANA" (apparently referring to ragocyte and antinuclear antibody, *see McManus v. Barnhart*, No. 5:04-CV-67-OC-GRJ, 2004 WL 3316303, at *4 nn. 37, 38 (M.D. Fla. Dec. 14, 2004)), he "could not find any clinical evidence of objective joint findings, rashes, and hepato-renal involvement to confirm a connective tissue disorder such as Rheumatoid Arthritis or Systemic Lupus." Aplt. Supp. App., Vol. II, at 320.

Dr. Superfine agreed that Ms. Meraou suffers from "fatigue, a possible connective tissue disorder, headaches, seizure disorder, irritable [bowel] and post-menopausal syndromes." *Id.* at 317. But he concluded that there were "insufficient physical and diagnostic findings to support a functional impairment" of disabling severity. *Id.*

The consultants did conclude, in some instances, that the diagnoses of particular ailments were unreliable because they were based on subjective reporting or were unsupported by available objective testing or other data. *See, e.g., id.* at 326 ("[I]t does not appear that any behavioral observations or objective data [concerning depression] were documented. Rather, this note primarily provides self reported symptoms."). Even a reliance on this reasoning, however,

-15-

would not have been arbitrary and capricious. The Plan provides that "'Total Disability' means the inability of [the] Participant, based upon *conclusive medical evidence*, to engage in any gainful occupation for which he or she is reasonably fitted by education, training or experience, as determined by the Plan Administrator." *Id.* at 404 (emphasis added). Ms. Meraou fails to show that it was unreasonable for the Committee to interpret this definition to require recent, *objective* evidence of the existence of a condition, particularly when the consulting physicians stated that such evidence should have been provided but was not. "Generally, it is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence." *Johnson*, 437 F.3d at 813 (brackets and internal quotation marks omitted); *see also, e.g., Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1099 (10th Cir. 1999) ("A rational plan administrator could find [a letter and two reports by a physician] insufficient [to establish disability based on diabetes] because they do not contain supporting data for the conclusions reached.").

### 2. Combined Effect of Impairments

Ms. Meraou complains that none of the consultants was asked to address Dr. Welden's conclusion that it is the combination of Ms. Meraou's impairments that has made her disabled. She contends that by asking many different specialists about her various conditions, the Committee evaluated each of her

-16-

disabling conditions in a "vacuum," an indicator of bad faith.  Aplt. Opening Br. at 27.

But there is no reason to doubt that the Committee's decision was based on consideration of a combination of Ms. Meraou's conditions.  Moreover, given the absence of sufficient evidence (in the view of the individual specialists) of functional limitations resulting from any of her conditions, it would be eminently reasonable to infer that the combination of her conditions would not result in disability.

### 3.  Dr. Bowman's Evaluation of Fibromyalgia

Ms. Meraou takes issue with Dr. Bowman's evaluation of her fibromyalgia. She argues that the evidence that she produced concerning this condition was sufficient to establish disability.  She specifically criticizes Dr. Bowman for requiring objective evidence of a condition which, by its very nature, can be established only by the report of a patient's  subjective symptoms.  *See Welch v. UNUM Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir. 2004) (fibromyalgia presents conundrum for insurers and courts because no objective test exists for proving the disease, its cause or causes are unknown, and its symptoms are entirely subjective).

Fibromyalgia is a disorder "'characterized by achy pain, tenderness and stiffness of muscles, areas of tendon insertions and adjacent soft-tissue structures.'"  *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 627 n.1 (10th Cir.

-17-

2003) (quoting *The Merck Manual* 481 (17th ed. 1999)). The condition can be diagnosed more or less objectively by examining for pain 18 trigger points on the body. *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003). Dr. Welden's notes indicate that Ms. Meraou experienced pain at 18 out of 18 of these trigger points. Dr. Bowman acknowledged the diagnosis of fibromyalgia, but rejected the assertion that it was of disabling severity, stating that Ms. Meraou "is noted to have fatigue and pain secondary to fibromyalgia. These are both subjective symptoms. The presence of trigger points [alone] would not constitute a disability." Aplt. Supp. App., Vol. I, at 237.

Ms. Meraou argues that Dr. Bowman's comments do not provide a convincing rationale for concluding that her fibromyalgia was not disabling. She contends that disability cannot be rejected simply because fibromyalgia involves only subjective symptoms. If this were true, fibromyalgia could never be disabling, a proposition that courts have rejected. *See Hawkins*, 326 F.3d at 919. She also argues that trigger points are indicators of the underlying disease process that are used as a diagnostic tool, and that Dr. Bowman's comment that their mere existence does not constitute a disability is therefore irrelevant and incorrect.

We note, however, that the Committee did not expressly adopt Dr. Bowman's reasoning. It indicated instead that it could not credit Ms. Meraou's allegations concerning fibromyalgia without more comprehensive

-18-

evidence concerning her recent medical condition, which Ms. Meraou failed to supply. Although acknowledging the diagnosis of fibromyalgia, it stated that as a general matter "there is no documentation within the last year of comprehensive musculoskeletal, joint, or neurologic examinations to support a significant functional impairment that would preclude you from working." Aplt. Supp. App., Vol. I, at 256. In view of this deficiency, Ms. Meraou was advised to submit medical data to support her appeal, including, but not limited to, a "Comprehensive Rheumatology evaluation." *Id.* As we have noted, she submitted some additional information, after much delay, but not a comprehensive examination by a rheumatologist. Denial of benefits is permissible when the allegedly disabling condition has been established only by the claimant's subjective complaints, and the claimant has failed to supply requested information that would allow the administrator to determine the ongoing effect of the condition. *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 877 (9th Cir. 2004).

In the case of a disease such as fibromyalgia, the claimant's subjective, uncorroborated complaints of pain constitute the only evidence of the ailment's severity. The medical inquiry is therefore intertwined with questions of the claimant's credibility, which are the province of the Plan administrator. *See id.* at 878 ("With a condition such as fibromyalgia, where the applicant's physicians depend entirely on the patient's pain reports for their diagnoses, their *ipse dixit*

cannot be unchallengeable. That would shift the discretion from the administrator, as the plan requires, to the physicians chosen by the applicant, who depend for their diagnoses on the applicant's reports to them of pain."). Ms. Meraou fails to show that the Committee's decision, based on her failure to submit recent, comprehensive medical evidence sufficient to establish the disabling nature of her fibromyalgia, was arbitrary and capricious. We therefore reject her challenge to this aspect of the Committee's decision.

### c. Social Security Disability Determination

The Plan required Ms. Meraou to apply for Social Security disability benefits as a condition of receiving benefits under the Plan. The Social Security Administration found her totally disabled, effective July 1992, and has continued to pay her benefits since that finding was made. Ms. Meraou appears to argue that in light of the reduction in cost to the Plan of her receipt of Social Security benefits over many years, the Plan should now be estopped from terminating her benefits.

To adopt this position, however, would be tantamount to requiring the Plan administrator to continue to pay benefits so long as Social Security benefits continue. As the district court noted, "The determination of disability under the Social Security regime cannot be equated with the determination of disability under the ERISA regime." Aplt. App. at 11 (citing *Black & Decker*, 538 U.S. at 832). We reject Ms. Meraou's argument that her past and continued receipt of

Social Security disability benefits required TWC to continue to pay benefits under the Plan despite its finding that she had failed to establish her entitlement to such continued benefits under the Plan requirements.

### d. Estoppel Based on Prior Disability Determination

Ms. Meraou argues that because TWC found her disabled in 1992 and her conditions have only worsened since then, it should be estopped from terminating her benefits now. The terms of the Plan, however, required her to prove her continued disability by supplying appropriate medical records. The Committee found that she had failed to do so. If the terms of a Plan "contemplate[] the ongoing review of all disability claims," the initial grant of disability benefits "does not foreclose subsequent principled review." *Kimber*, 196 F.3d at 1098.

### e. District-court Review

Ms. Meraou questions whether the district court actually considered the record as a whole, particularly since it failed to mention the videotaped interview that she submitted to the Committee. But because our review of the district court's decision is de novo, any such error by the district court would be immaterial.

The judgment of the district court is AFFIRMED.

Entered for the Court

Harris L Hartz
Circuit Judge