**Michelle LAMONT, Plaintiff,**

v.

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, d/b/a CIGNA Group Insurance, Defendant.**

**Civil Action No. 15–cv–0686–WJM–CBS**

United States District Court, D. Colorado.

Signed 07/29/2016

Thomas A. Bulger, Silvern & Bulger, P.C., Wheat Ridge, CO, for Plaintiff.

Jack M. Englert, Jr., Holland & Hart, LLP, Greenwood Village, CO, for Defendant.

## ORDER REVERSING TERMINATION OF BENEFITS

William J. Martínez, United States District Judge

In this case brought pursuant to 29 U.S.C. § 1132(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), Plaintiff Michelle Lamont ("Lamont") challenges the decision of Defendant Connecticut General Life Insurance Company ("CIGNA") to terminate her long-term disability insurance benefits. (ECF No. 1.) Currently before the Court is the parties' Joint Motion for Judgment on the Pleadings. (ECF No. 24.) For the reasons explained below, the Court finds that CIGNA's choice to terminate Lamont's disability benefits was arbitrary and capricious. Lamont will therefore be

awarded past-due benefits and reinstatement of those benefits going forward.

## I. BACKGROUND

Lamont worked for Lockheed Martin from approximately 1980 to May 12, 1990, by which time she had become a contract administrator. (ECF No. 18 at 6, ¶ B1.)[1] Various medical ailments then forced her to stop working. (*Id.* at 7, ¶ B3.) The parties have pointed the Court to nothing in the record specifying precisely what ailments Lamont claimed at that time, but it appears that fibromyalgia and chronic fatigue syndrome ("CFS") were the driving factors. They remain the "primary diagnoses" today,[2] although she claims a total of twenty-six diagnosed conditions. (*Id.* ¶ C1.)

At the onset of her disabling conditions in May 1990, Lamont was covered by a long-term disability policy administered by CIGNA ("Plan"). (Administrative Record ("R.") (ECF No. 16) at 379–400.) As to Lamont, at least, this Plan remains in force today. Its provides twenty-four months of benefit payments if sickness or accidental injury prevented a covered individual from performing his or her own job. (R. at 388.) After those twenty-four months, the Plan permits continuing benefits up through the covered individual's 65th birthday if the individual remains "completely prevented from engaging in any occupation or employment for which he [or she] is qualified, or may reasonably become qualified." (*Id.*)

Lamont applied for and received both the twenty-four month disability benefit and the extended benefit. (ECF No. 18 at

---

1. All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination, particularly if the document has prefatory material such as a table of contents.

2. Lamont also claims chronic fatigue immune dysfunction syndrome ("CFIDS") as a primary diagnosis. (*Id.*) However, Lamont usually treats CFS and CFIDS as a materially indistinguishable unit. (*See id.* ¶¶ C1, C2.) For simplicity, the Court will refer to CFS only.

10, ¶ E1.) She therefore received disability payments from 1990 through January 2014, when CIGNA terminated her benefits for reasons discussed below. Throughout these approximately twenty-three years, Lamont's disability claim "was reviewed (and approved) on a regular basis." (*Id.*)

In mid–2013, while still paying benefits to Lamont, CIGNA initiated a "file review" because Lamont's "current functionality [was] not clear." (R. at 485.) Lamont was approximately fifty years old at the time. (*Id.*) CIGNA requested information from Lamont, who reported that fatigue, pain, and cognitive difficulties rendered her bedridden most of the day. (*Id.*) CIGNA also requested and received updated medical records from Lamont's two primary treating physicians, Dr. Michael Mignoli (family practice) and Dr. Eric Westerman (rheumatology). (ECF No. 19 at 17, ¶ 5.)

Dr. Mignoli's records cover numerous visits and interactions for various issues (mostly sleep-related) from February 2012 through May 2013. (R. at 1863–1914.) These records mention Lamont's fibromyalgia in the context of refilling a prescription, but also show that Dr. Westerman was primarily addressing fibromyalgia. (R. at 1868.) The records contain no direct discussion of treatment for CFS.

Dr. Westerman's records document two office visits from Lamont, one in February 2012 and the other in January 2013. (R. at 1823–30.) The records for each visit are identical in certain respects. In both, her chief complaints were listed as joint pain and fibromyalgia. (R. at 1823, 1827.) In both, her rang e of motion in all limbs was described as "full and painless," but "FMS [fibromyalgia syndrome] tender points [were] noted" as well. (R. at 1825, 1829.) At her January 2013 visit, Dr. Westerman recorded with regard to Lamont's fibro-

myalgia that Lamont "is still not doing well d[e]spite meds." (R. at 1829.)

Dr. Westerman also completed, at CIGNA's request, a physical ability assessment. (R. at 1813–14.) In that assessment, Dr. Westerman checked the box indicating that Lamont could sit "frequently," defined as 2.5–5.5 hours per day or 1/3–2/3 of the day. (R. at 1813.) As to the activities of standing, walking, reaching, fine manipulation, simple grasp, and firm grasp, Dr. Westerman checked the box for "occasionally," defined as 0–2.5 hours per day or 0–1/3 of the day. (*Id.*) As to the activities of lifting, carrying, pushing, pulling, climbing, balancing, stooping, kneeling, crouching, crawling, and using lower extremities for foot controls, Dr. Westerman again checked the box for "occasionally," but he specifically circled the zero in "0–1/3 of the day." (R. at 1814.) As for seeing and hearing, Dr. Westerman selected "constantly," defined as greater than 5.5 hours per day or 2/3 of the day. (*Id.*)

In late June 2013, CIGNA sent Dr. Westerman's physical ability assessment to a vocational rehabilitation counselor for analysis. (R. at 508.) The counselor found that, based on Lamont's work history alone, Lamont could likely perform certain "sedentary and light occupations," assuming "no additional L&Rs" (presumably, "limitations and restrictions"). (*Id.*) However, "[b]ased on the ... L&Rs [evident in Dr. Westerman's assessment], Ms. Lamont [was] functioning at a below sedentary capacity." (*Id.*)

The following month, CIGNA assigned its "special investigations unit" to conduct covert surveillance of Lamont. (R. at 2297.) The investigators observed Lamont from July 20 to July 22, 2013 and "found the claimant to be inactive. On each day of the investigation, the claimant was not observed engaging in any activity outside of

her residence for the duration of the surveillance periods." (*Id.*)

About six weeks later, someone at CIGNA "[s]uggested that [it] complete[ ] another SIU, when [Lamont's] daughter is in school." (R. at 484.) This same individual also suggested a "sedentary FCE," *i.e.*, a functional capacity evaluation for sedentary work. (*Id.*)

Drawing upon the Plan's grant of authority to CIGNA "to examine any person for whom a claim is pending as often as [CIGNA] may reasonably require," CIGNA informed Lamont in September 2013 that it would be scheduling an FCE. (R. at 502, 601.) The FCE, conducted by a physical therapist, ultimately took place in November 2013. (R. at 2276–80.) The relevant portions of the therapist's report are as follows:

> The results of this evaluation indicate that Michelle Lamont terminated all testing due to reports of increased pain and fatigue following musculoskeletal screening.
>
> Michelle Lamont demonstrated Constant sitting, Occasional standing, Rarely walking, Frequent reaching at desk level, Occasional balancing, Occasional object handling, Occasional fingering, Occasional simple hand grasp, Occasional firm hand grasp, Occasional fine/gross hand manipulation.
>
> \* \* \*
>
> Deficits identified during testing include: Client was able to ambulate 10' with wheeled walker with complaints of increased dizziness/lightheadedness. She required assistance for standing. Required moderate assist [from] evalu[a]tor for stability during movement for lumbar range of motion.
>
> Michelle Lamont terminated testing prior to isometric, lifting and positional tolerance testing due to subjective complaints of increased pain and fatigue[;]

therefore her functional abilities are unable to be determined.

(R. at 2282.) A later addendum to this report adds that Lamont "terminated all testing prior to hand dexterity testing so all hand manipulative tolerances were observed functionalities," or in other words, activities that the therapist saw Lamont do of her own accord rather than at the therapist's direction. (R. at 2276.) Also, Lamont "was not observed to lift anything heavier than her 16 oz water bottle while in the clinic." (*Id.*) Based on the FCE report, a vocational rehabilitation counselor performed a transferable skills analysis and concluded that Lamont had the physical capacity to perform sedentary jobs such as space scheduler, information clerk, customer complaint clerk, and gate guard. (R. at 2272–73.)

As it turns out, CIGNA's special investigations unit was covertly observing Lamont on the day before, day of, and day after the FCE. (R. at 2231.) The investigators again reported back observations consistent with Lamont's claim of disability:

> On the first and third days of surveillance, the claimant was not seen engaging in any activity outside the residence. On the second day, the claimant was picked up by a transportation service and driven to her scheduled medical appointment. She remained at the appointment for several hours before she was picked up by the same transportation service and was then driven back to her residence. W e have obtained approximately six minutes of film of the claimant utilizing a motorized chair, being lifted into and out of the van on a wheelchair ramp, and in general while moving about in a slow manner with the use of a motorized wheelchair.

(*Id.*)

In mid–December 2013, the CIGNA claims manager assigned to Lamont's case

reviewed all of the materials gathered over the past year and concluded that the FCE combined with the transferable skills analysis showed that Lamont could perform sedentary occupations. (R. at 483.) Thus, CIGNA concluded she no longer qualified for disability payments.

CIGNA's written explanation to Lamont contains no direct discussion of Lamont's fibromyalgia or CFS. Rather, it states that it was "unable to confirm any medical documentation or treatment to support a functional impairment as a result of a cognitive nature [*sic*]." (R. at 2217.) The claims manager's internal notes similarly state, "There is no medical documentation to support any cognitive L&R's." (R. at 483.) Neither CIGNA's written explanation nor its internal notes discuss the history of Lamont's disability or the reasons why she had been approved and repeatedly reapproved for benefits over the preceding decades. CIGNA's records also contain no claim that Lamont's condition changed in any way from any previous time in which her benefit payments were approved or reapproved.

CIGNA terminated Lamont's disability payments as of December 17, 2013. (R. at 2216.) CIGNA, however, paid "additional benefits" through January 17, 2014, "[i]n an attempt to prevent financial hardship." (*Id.*)

Lamont administratively appealed CIGNA's decision. CIGNA then requested a review of the file from an independent physician, Dr. Kevin Trangle. In June 2014, Dr. Trangle submitted a lengthy report to CIGNA. (R. at 2422–50.) Dr. Trangle summarized all of Lamont's medical records available to him, beginning in September 1990 and ending in April 2014. (R. at 2423–30.) This summary generally reflected Lamont's complaints of chronic pain and fatigue, although with emphasis on the lack of objective diagnostic support for those complaints.

Dr. Trangle also recounted telephone conversations he had with Dr. Westerman and Dr. Mignoli. Dr. Westerman reportedly "stated that as far as he is concerned there are no objective abnormalities. * * * His feeling and concern is that [Lamont] has what the psychiatrist's evaluation suggested[:] somatoform disorder.[3] She has

---

**3.** The psychiatrist in question is unspecified. The only psychiatrist mentioned in Dr. Trangle's summary of medical records is Dr. Robert Hoffman, who examined Lamont in 1991. (*See* R. at 2423.) According to Dr. Trangle, Dr. Hoffman "opined [that] Ms. Lamont had a conversion disorder and psychological factors in regard to her CFS." (*Id.*) At that time, "conversion disorder" was defined as a condition "in which the predominant disturbance is a loss of or alteration in physical functioning that suggests physical disorder but which instead is apparently an expression of a psychological conflict or need." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 244 (3d ed. 1980). Conversion disorder was categorized as a particular type of somatoform disorder, meaning

    [a] group of disorders [with] physical symptoms suggesting physical disorder ... for which there are no demonstrable organic

findings or known physiological mechanisms and for which there is positive evidence, or a strong presumption, that the symptoms are linked to psychological factors or conflicts. Unlike Factitious Disorder or Malingering, the symptom production in Somatoform Disorders is not under voluntary control, i.e., the individual does not experience the sense of controlling the production of the symptoms.

*Id.* at 241. (The most recent DSM eliminates "somatoform disorders" as a category and largely replaces it with "somatic symptom and related disorders." *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 309 (5th ed. 2013).) Dr. Trangle does not make clear whether Dr. Westerman was aware of Dr. Hoffman's opinion and agreed with it, or whether Dr. Westerman instead expressed some opinion that happened to be consistent

continually, however, refused any psychiatric or psychological assessment, evaluation or treatment." (R. at 2432.) As for Dr. Mignoli,

> [h]e indicated that [Lamont's] chief complaint was simply fatigue. He not only felt that she could not ambulate and was just too weak to walk, but in many cases needed her electric wheelchair.
>
> He acknowledged that there were no objective abnormalities that were ever found in Ms. Lamont. . . .
>
> Nonetheless, Dr. Mignoli is of the firm conviction that because of her weakness she is completely and totally disabled. He does acknowledge that she has not acquiesced or agreed to any neuropsychiatric, neuropsychological or testing of any sort for psychiatric or psychological disease.

(*Id.*)

Following this narrative, Dr. Trangle offered a detailed discussion of the current medical understanding of fibromyalgia, CFS, and closely related syndromes. (R. at 2435–42.) Similar to his summary of Lamont's medical history, Dr. Trangle's discussion regarding these diseases continually returns to the lack of objectively verifiable signs of injury, illness, or anatomical malfunction in patients diagnosed with fibromyalgia or CFS. Regarding fibromyalgia specifically, Dr. Trangle concludes that "it is more of a psychiatric or psychosomatic problem as opposed to a true disease. It is of ten manifested exclusively by subjective expressions of pain without any objective findings at all." (R. at 2441.) As for CFS, "[t]he actual existence of the disorder has been questioned by many," and "[i]t has been questioned if the 'label' CFS is disabling. Individuals labeled with CFS may perceive themselves and symptoms in such a way as to

be a self-fulfilling prophecy of non-recovery[.]" (R. at 2441, 2442.)

Dr. Trangle's ultimate conclusion is worth reprinting in full, given its relevance to the Court's analysis below:

> Overall, the objective medical evidence in this case is insufficient to support the existence of functional impairment to the degree alleged by Ms. Lamont. Her diminished functionality has no known physiological basis and her objective physical findings do not support the existence of significant weakness or other neuromuscular impairment.
>
> Work activity restrictions are not necessary in this case as Ms. Lamont's primary diagnoses of FM and CFS are not associated with any risk of physical harm to her person with respect to determining her functional limitations, one cannot rely on her most recent FCE as she discontinued testing due to subjective complaints of fatigue and increased pain. The results from the FCE do support her ability to perform minimally in a sedentary capacity.
>
> Having discussed with Dr. Westerman[,] he cannot pinpoint any objective evidence that would preclude her from working or functioning. Dr. Mignoli feels more strongly that she is not able to work or function in any form or fashion because of her fatigue.
>
> However, looking at this from an objective perspective[,] neither of the treating physicians can point to any specific objective abnormalities to support this contention.
>
> As such, my opinions as expressed above remain operative in this matter; based upon a reasonable degree of medical certainty she is capable of sustained re-

with Dr. Trangle's interpretation of Dr. Hoffman's findings.

munerative employment and in an unrestricted capacity.

(R. at 2443.)

CIGNA's final decision in Lamont's appeal is little more than a summary of Dr. Trangle's report. (R. at 585–88.) CIGNA particularly noted that there is "no current proven pathophysiology" for fibromyalgia or CFS and that Drs. Westerman and Mignoli acknowledged a lack of "objective abnormal tests that would explain the plethora of symptoms." (R. at 586.) CIGNA also emphasized the lack of "formal neuropsychological testing . . . and no verified cognitive disorder," along with "a complete lack of psychiatric or psychological treatment with a mental health professional." (R. at 587.) CIGNA ultimately affirmed its original decision that Lamont has no objectively verifiable symptoms and that her physical functional capacity is enough to sustain sedentary work; therefore, she no longer qualifies as disabled under the Plan. (*Id.*)

This lawsuit followed.

## II. LEGAL STANDARD

■ ERISA governs employee benefit plans, including disability benefit plans. 29 U.S.C. §§ 1101 *et seq.* "When an individual covered by the plan makes a claim for benefits, the administrator gathers evidence, including the evidentiary submissions of the claimant, and determines under the plan's terms whether or not to grant benefits. If the administrator denies the claim, the claimant may bring suit to recover the benefits due to him under the terms of his plan." *Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1308 (10th Cir. 2007) (internal quotation marks omitted; alterations incorporated). Federal courts have exclusive jurisdiction over such suits, as ERISA preempts most relevant state laws. 29 U.S.C. § 1144(a).

■ The Supreme Court has held that "a denial of benefits challenged under [the civil enforcement provision of ERISA, 29 U.S.C.] § 1132(a)(1)(B)[,] is to be reviewed under a de novo standard unless"—as is the case here (*see* R. at 1)—"the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In such a situation, the Court determines whether the denial of benefits was arbitrary and capricious. *Id.*

■ Under the arbitrary and capricious standard, the administrator's decision need not be the only logical one or the best one; the decision will be upheld provided that it is "grounded on any reasonable basis." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999). "The reviewing court need only assure that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end." *Nance v. Sun Life Assurance Co. of Can.*, 294 F.3d 1263, 1269 (10th Cir. 2002). [4]

## III. ANALYSIS

■ According to Lamont, CIGNA discontinued her disability benefits because

---

4. The parties agree that CIGNA both evaluates and pays any claim for benefits. CIGNA therefore has an inherent conflict of interest between its own desire to turn a profit and its fiduciary duty to fairly evaluate all claims. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). The effect of that conflict of interest, if any, is one factor that this Court must consider when evaluating whether CIGNA's decision was arbitrary and capricious. *Id.* at 117, 128 S.Ct. 2343. The Court's analysis below would be the same regardless of the conflict of interest. The Court therefore will not give it any further discussion.

no objective medical findings supported her subjective complaints of pain and fatigue. Lamont argues that CIGNA's alleged reasoning "creates a blanket exclusion for [diseases such as fibromyalgia and CFS] simply because they are based on subjective reports, or because the medical opinions are based on subjective criteria, despite no such language in the [Plan]." (ECF No. 18 at 3–4.) CIGNA responds that Lamont is overlooking "the critical distinction between the evidence of a functional impairment and the evidence of a medical condition or diagnosis." (ECF No. 19 at 31.) CIGNA insists that it "focused its review on evidence of functional impairment, not the evidence of any diagnosis or condition," and reasonably concluded that Lamont possesses the functional capacity for sedentary work despite her diagnoses. (*Id.* at 9, 33–39.) The Court concludes that Lamont more accurately characterizes CIGNA's true reasoning.

██ Under the circumstances of this case, the arbitrary and capricious analysis must account for two special factors. The first factor is the specific diseases at issue, fibromyalgia and CFS. No one disputes that "fibromyalgia presents [a] conundrum for insurers and courts because no objective test exists for proving the disease, its cause or causes are unknown, and its symptoms are entirely subjective[.]" *Meraou v. Williams Co. Long Term Disability Plan*, 221 Fed.Appx. 696, 705 (10th Cir. 2007) (summarizing *Welch v. UNUM Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir. 2004)). T he same can be said for CFS, as recognized by Dr. Trangle: "The overlap between [fibromyalgia] and CFS is extensive and the label given to a particular patient may depend more on the specialty of the physician making the diagno-

sis then on the features of the disease." (R. at 2435.)[5] In other words, fibromyalgia and CFS—if they are distinct diseases—are often fellow travelers ("comorbid," in medical jargon) and produce overlapping symptoms with no scientifically perceptible cause. Thus, "the claimant's subjective, uncorroborated complaints of pain [or fatigue] constitute the only evidence of the ailment's severity. The medical inquiry is therefore intertwined with questions of the claimant's credibility, which are the province of the Plan administrator." *Meraou*, 221 Fed.Appx. at 705.

██ The second special factor is that the decision in question was to discontinue benefits, rather than to deny them from the start. In this situation, the Tenth Circuit has endorsed the Eighth Circuit's reasoning in *Kecso v. Meredith Corp.*, 480 F.3d 849 (8th Cir. 2007): "unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." *Williams v. Metro. Life Ins. Co.*, 459 Fed. Appx. 719, 731 (10th Cir. 2012) (quoting *Kecso*, 480 F.3d at 854).

In short, Lamont's credibility and CIGNA's own previous approval of benefits for Lamont are indispensable considerations. CIGNA, however, fails to discuss either of them in its original decision to discontinue benefits. CIGNA relied heavily on the incomplete FCE and the transferable skills analysis based on it (*see* R. at 483), but there was no discussion of whether the FCE showed improvement over prior FCEs or similar assessments—of which, according to CIGNA, there are "[s]everal ... [a]ll support[ing] the severity of [La-

---

**5.** The Tenth Circuit has previously noted occasions when physicians had trouble distinguishing fybromyalgia, CFS, and similar dis-

orders. *See Garside v. Barnhart*, 113 Fed. Appx. 300, 301 (10th Cir. 2004).

mont's] condition(s)." (R. at 1071.) Nor did CIGNA discuss Lamont's credibility.

At the appellate level, CIGNA again failed to discuss Lamont's credibility or its own previous approval of benefits. (R. at 585–88.) CIGNA instead relied heavily on Dr. Trangle's analysis, which says nothing about prior disability benefits, and only approaches credibility with the statement that "the objective medical evidence in this case is insufficient to support the existence of functional impairment to the degree alleged by Ms. Lamont." (R. at 2443.) This perhaps implies an opinion that Lamont is not credible, but the reasoning behind the implication essentially comes down to the lack of objective diagnostic findings.

■ The Court will return momentarily to that question of objective findings versus subjective complaints, but the topic of previously awarded benefits deserves additional discussion first. Rather surprisingly, CIGNA claims that the entire "administration of Lamont's claim before 2013 ... is not relevant" to whether it permissibly terminated benefits in December 2013. (ECF No. 19 at 17 n.3.) Although the Court does not hold that it is *per se* arbitrary and capricious for an insurer to fail to *discuss* its own prior decision(s) to award disability benefits, the claimant's prior receipt of disability payments cannot be considered irrelevant. Rather, it is at least a factor "that must weigh against the propriety of an insurer's decision to dis-

continue those payments." *Williams*, 459 Fed.Appx. at 731. Total failure to discuss prior benefits certainly raises the suspicion of an inadequately reasoned decision.

This is especially so in Lamont's case, where she had already received disability payments from CIGNA without question for more than twenty years. This is not a situation where an insurer granted benefits for only a few years, giving itself time to investigate more fully. *Cf. Williams*, 459 Fed.Appx. at 731–32 (payments terminated after three-and-a-half years). Rather, CIGNA was nearing a quarter-century of benefit payments when it decided to reevaluate Lamont's file. Of course it is entitled to reevaluate her file at any time, *see id.* and it has done so many times before. But the reasons for such a lengthy payment history essentially demand discussion if payments will now be terminated. What changed? Has the claimant's functional capacity improved? Or has the claimant's functional capacity always been better than previously believed, but the insurer failed to discover information suggesting as much until now?[6]

CIGNA does not answer these questions, although its reasoning strongly suggests that it believes Lamont has long been more functionally capable than previously believed. It does not say as much, however. It says only that Lamont is *now* functionally capable of sedentary work,

---

6. *Williams* appears to approve of a third potential scenario, namely, "a new file review from [a] reviewing physician." 459 Fed.Appx. at 731. At face value, this would seem to endorse the practice of every now and then sending out the file, materially unchanged, to a new physician to see if *that* physician believes the claimant is disabled. The Court does not read *Williams* to go this far. Rather, *Williams* was heavily influenced by the Eighth Circuit's *Kecso* decision and its worry that a too-strict reevaluation standard would motivate insurers to deny more claims than they

should out of fear that granting the claim might prove irreversible. *Id.* at 731–32. This is a valid concern in the circumstances discussed in *Kecso* and endorsed in *Williams*, *i.e.*, an insurer providing itself a few years of breathing room to investigate after initial award of benefits—in other words, giving the claimant the initial benefit of the doubt. This concern has much less force after the passage of substantial time and multiple re-approvals of a claimant's benefits. In that circumstance, the "what changed?" inquiry becomes inescapably salient.

whether or not she has been in the previous twenty-plus years. If substantial evidence supports that conclusion, this Court must uphold CIGNA's termination of benefits. Nonetheless, in the substantial evidence analysis, the denominator (all available evidence) is as important as the numerator (the evidence relied upon to reach a decision). Lamont's prior disability determinations therefore remain relevant in the ensuing analysis.

The Court thus turns to the question of whether CIGNA reasonably concluded that Lamont now possesses the functional capacity for sedentary work. It bears noting that CIGNA's numerator, both at the initial and appellate levels, ultimately comprises (a) the half-completed FCE in November 2013 and the transferable skills assessment based upon it, and (b) the observation that Lamont's medical records contain no objective support for her symptoms. The Court concludes that this is not a sufficient quantum of evidence from which reasonable minds could conclude that Lamont is no longer disabled under the Plan's definition.

Concerning the November 2013 FCE, the Court need not examine whether a half-complete evaluation, terminated by the claimant due to pain and fatigue, is an appropriate piece of evidence in support of a non-disability finding. Assuming it was, it was also essentially meaningless in these circumstances without an evaluation of Lamont's cognitive abilities. Lamont and her doctors do not claim that she cannot move her limbs, or cannot bend over, or anything of that sort—which is what the FCE tested. They instead claim that her pain and fatigue, admittedly of unknown origin, prevent her from maintaining the focus and persistence necessary for regular, gainful employment. That has always been the basis of Lamont's disability claim, and

CIGNA accepted it for more than twenty years.

What, then, did CIGNA do to reevaluate *that* claim? The record shows only that CIGNA twice arranged for covert surveillance. In both instances, the investigators saw nothing that could possibly cast doubt on Lamont's claims of pain and fatigue.

Drawing on Dr. Trangle, CIGNA points out that Lamont has refused her doctors' suggestions of psychological testing. This may be another attempt to address Lamont's reported cognitive disabilities. However, nothing in the record suggests that Lamont refused any request *from CIGNA* for psychological or cognitive function testing—something CIGNA could certainly demand under the terms of the Plan, as it did the FCE. *Cf. Meraou*, 221 Fed. Appx. at 704–06 (disability payments terminated after ten years, due in part to insurer's reasonable adverse credibility determination based on claimant's failure to cooperate with reevaluation). Thus, the fact that Lamont has never chosen to seek psychotherapy or similar treatment is not relevant to any conclusion regarding the severity of her cognitive disabilities. Given this, the FCE and the transferable skills conclusions based upon it are not, by themselves, probative of whether Lamont has regained the ability to work. *Cf. Kaferly v. Metro. Life Ins. Co.*, 189 F.Supp.3d 1085, 1102–03 (D. Colo. 2016) (insurer's termination of benefits not reasonably supported when based on claimant's physical abilities alone, with no discussion of cognitive abilities).

Substantial evidence likely would exist, however, if CIGNA could also reasonably conclude that Lamont is not credible in her claims of disabling pain and fatigue. This reprises the topics of objective medical evidence versus subjective complaints. As already noted, this is the essential difficulty with fibromyalgia, CFS, and related

syndromes. Dr. Trangle's analysis acknowledges (as it must) that fibromyalgia and CFS are, by definition, diagnoses based on subjectively reported symptoms that cannot be backed up with objective diagnostic testing. (*See* R. at 2435–42.) CIGNA's analysis falters because it fails to grasp the implications. Dr. Trangle and CIGNA repeatedly point out the lack of objective diagnostic findings as if that by itself is a reason to be suspicious of Lamont's claims. It is not. It is nothing more than a reaffirmation of her diagnosis. Thus, lack of diagnostic confirmation is irrelevant to Lamont's credibility.

The question CIGNA never addresses is why, apart from the lack of diagnostic confirmation, Lamont's subjective reports of the limitations she faces should not be believed. Having failed to address this, CIGNA cannot now claim that substantial evidence supported its decision to discontinue Lamont's disability payments, particularly given CIGNA's choice to approve those payments previously on a record of essentially the same symptoms that Lamont continues to claim. CIGNA's decision therefore was arbitrary and capricious. *See, e.g., Kaferly*, 189 F.Supp.3d at 1103 (insurer could not "ignore Plaintiff's own reports of pain, cognitive impairments, and other subjective reports of limiting conditions absent a stated reason for doing so"); *Buss v. United of Omaha Life Ins. Co.*, 2014 WL 4377693, at *15 (D. Kan. Sept. 4, 2014) ("United simply had no new evidence since its last review of Buss's claims that would justify changing its decision that Buss was disabled. After previously granting Buss long-term disability benefits on essentially the same information, United's reversal was arbitrary and capricious, as it had no new information showing an improvement in Buss's condition.").

Lamont will therefore be awarded past-due benefits through the date of judgment,[7] and the Court will order that her benefits be reinstated as of the date of judgment.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  The parties' Joint Motion for Judgment on the Pleadings (ECF No. 24) is GRANTED in favor of Plaintiff and DENIED as to Defendant;

2.  The Clerk of Court shall enter judgment in Plaintiff's favor. Plaintiff is entitled to an award of past long-term disability benefits from the date of termination (January 18, 2014) through the date of judgment, and Plaintiff's long-term disability benefits shall be reinstated as of the date of judgment;

3.  Plaintiff may file an appropriate motion for attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

4.  The Clerk shall terminate this case.

---

7. In passing, Plaintiff requests interest on past-due benefit payments, but does not specify any prejudgment interest rate. (*See* ECF No. 18 at 15.) The Court therefore denies prejudgment interest.